IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee,*

*v.*

JOSE ALEJANDRO ACUNA VALENZUELA,
*Appellant.*

No. CR-14-0351-AP
Filed September 25, 2018

Appeal from the Superior Court in Maricopa County
The Honorable Peter C. Reinstein, Judge
No. CR2011-140108
**AFFIRMED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor
General, Lacey Stover Gard, Chief Counsel, Jeffrey L. Sparks (argued),
Assistant Attorney General, Capital Litigation Section, Phoenix, Attorneys
for State of Arizona

Bruce Peterson, Office of the Legal Advocate, Kerri L. Chamberlin
(argued), Colin F. Stearns, Deputy Legal Advocates, Phoenix, Attorneys
for Jose Alejandro Acuna Valenzuela

VICE CHIEF JUSTICE BRUTINEL authored the opinion of the Court, in
which CHIEF JUSTICE BALES and JUSTICES PELANDER, TIMMER,
BOLICK, and GOULD and JUDGE JONES* joined.

---

* Justice John R. Lopez, IV has recused himself from this case. Pursuant to
article 6, section 3 of the Arizona Constitution, the Honorable Kenton D.
Jones, Judge of the Arizona Court of Appeals, Division One, was designated
to sit in this matter.

VICE CHIEF JUSTICE BRUTINEL, opinion of the Court:

¶1        This automatic appeal arises from Jose Alejandro Acuna Valenzuela's ("Acuna") convictions and death sentence for the murder of Edgar S.  We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and 13-4033(A)(1).

¶2        In August 2011, Edgar S. and his girlfriend Perla M. went to a local Baskin-Robbins to get ice cream.  They saw Acuna, who had previously been Edgar's friend.  In 2008, Edgar had testified against Acuna during a criminal proceeding in which Acuna was sentenced to prison.  Thereafter, their relationship soured.

¶3        When Acuna saw the couple inside Baskin-Robbins, he looked at them twice, his eyes widened, and he walked toward an exit door and yelled at Edgar, "I told you I didn't want to [expletive] see you."  Once outside, Acuna saw Sandra P., a friend from high school, who was running errands in the same shopping complex.  Acuna appeared upset while talking with Sandra, saying (about Perla) that she "told me that she hadn't seen him, that she wasn't talking to him no more," and she "lied to me," and (about Edgar) that "I did prison time for him."  Sandra offered to help Acuna, reassuring him that she would support him in a fight against Perla.

¶4        After Edgar and Perla left the Baskin-Robbins and got into Perla's car, Edgar said, "Baby, he's coming."  Over her right shoulder, Perla saw Acuna running and firing a gun at her vehicle. Bullets shattered the car window and struck Edgar.  Edgar tried to get out of the vehicle while Acuna continued to run behind the car and shoot at Perla.  Acuna then left the scene in Sandra's car.

¶5        Edgar sustained multiple bullet wounds, and Perla was hit in her upper back.  She survived, ultimately undergoing two surgeries.  Edgar died from his injuries.

¶6        Acuna was convicted after trial of first degree murder, attempted first degree murder, discharge of a firearm at a structure, and misconduct involving weapons.   The jury found two aggravating circumstances: (1) that Acuna had been previously convicted for another serious offense (the attempted first degree murder of Perla); and (2) that he murdered Edgar in retaliation for testimony in a court proceeding.  A.R.S.

§ 13-751(F)(2), (F)(12). Considering these factors and the mitigation evidence, the jury decided that Acuna should be sentenced to death for Edgar's murder. For the other convictions, the trial court imposed concurrent prison sentences, the longest for 15.75 years, to be served consecutively to the death sentence.

## DISCUSSION

### A. Misconduct-Involving-Weapons Charge

¶7 Acuna contends the trial court erred by failing to sua sponte sever the misconduct-involving-weapons charge, thus permitting the jury to hear that he was a convicted felon. Because Acuna did not object at trial, we review only for fundamental error. *See State v. Laird*, 186 Ariz. 203, 206 (1996).

¶8 Before trial, the State noticed its intent to present evidence of Acuna's previous felony conviction and Edgar's prior testimony against Acuna as other-act evidence showing motive. *See* Ariz. R. Evid. 404(b); *State v. Ferrero*, 229 Ariz. 239 (2012). At trial, the State introduced testimony that Edgar had "testified in a previous criminal matter against" Acuna, that Acuna was not legally entitled to possess a firearm because "[h]e was a prohibited possessor [and h]e had a prior felony conviction," that the felony conviction was for a "lesser charge," and that he had been sentenced to the Department of Corrections for 2.25 years. A minute entry from the previous trial, as well as a Maricopa County Superior Court affidavit (stating there was no court record showing that Acuna's right to possess a firearm had been restored following his felony conviction), and redacted copies of Acuna's prison records were all admitted.

¶9 Under the version of Rule 13.4(a) in effect at the time of trial, the trial court was authorized, but not required, to order a severance of offenses on its own initiative when "necessary to promote a fair determination of the guilt or innocence of any defendant of any offense." Ariz. R. Crim. P. 13.4(a) (2011) (emphasis added).[1] But, "[t]he right to

---

[1] The 2011 version of Rule 13.4(a) applies because of its later, substantive change from a discretionary to a mandatory standard. *See State v. Smith*, 184 Ariz. 456, 460 (1996) (recognizing the adoption of federal retroactivity

severance is waived if the defendant fails to timely file and renew a proper motion for severance." Ariz. R. Crim. P. 13.4(c).

¶10 The trial court did not err, much less commit fundamental error, in failing to sua sponte order severance. Acuna argues the trial court had a duty to protect his constitutional rights, relying upon *State v. Torres*, 206 Ariz. 52, 58 ¶ 18 (App. 2003), *vacated in part*, 208 Ariz. 340 (2004). *Torres*, however, is distinguishable as it addressed a defendant's right to competent counsel, a right especially "vulnerable to violation." *See State v. Longoria*, 123 Ariz. 7, 10 (App. 1979) (stating that Rule 13.4 "does not require the court to order a severance; it only gives it the discretion to do so on its own initiative").

¶11 Acuna also argues that the trial court erred by allowing evidence of his prior felony conviction as extrinsic evidence and by permitting the State to refer to the conviction as a "less serious offense." We review a trial court's evidentiary rulings for an abuse of discretion but interpret the Arizona Rules of Evidence de novo. *State v. Steinle*, 239 Ariz. 415, 417 ¶ 6 (2016).

¶12 Arizona Rule of Evidence 404(b) provides that evidence of other acts is admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." To introduce such evidence, a proper purpose must be shown under Rule 404(b), it must be relevant under Rule 402, the probative value of the evidence must not be substantially outweighed by its potential prejudicial effect under Rule 403, and the court must give a proper limiting instruction if requested under Rule 105. *State v. Hulsey*, 243 Ariz. 367, 381–82 ¶ 45 (2018); *see also State v. Mott*, 187 Ariz. 536, 545 (1997).

¶13 The trial court did not err in admitting the sanitized evidence. Proof of Acuna's prior conviction was relevant to prove motive under Rule

analysis principles that new procedural rules announced for criminal cases must generally be applied retroactively to cases not yet final); *but see State v. Thompson*, 68 Ariz. 386, 390 (1949) (recognizing that rules of criminal procedure can still grant a "substantial rather than a mere procedural or technical right"); *Aranda v. Indus. Comm'n of Ariz.*, 198 Ariz. 467, 470 ¶ 11 (2000) ("Enactments that are procedural only, and do not alter or affect earlier established substantive rights may be applied retroactively.").

404(b), as it was directly related to his statement, immediately before the murder, that he "did prison time for [Edgar]." In addition, the trial court sanitized the conviction by allowing reference only to a "less serious offense."

¶14 The trial court's order supporting this ruling was brief. It stated that the court conducted "a Rule 403 analysis" and found "that the prejudicial effect of telling the jury" about the specific charge on which Acuna was previously convicted "outweigh[ed] its probative value." Although we encourage trial courts to make their 404(b) findings on the record, the record here nevertheless supports the court's ruling. *See State v. Jeffers*, 135 Ariz. 404, 417 (1983) (stating we will affirm a trial court's Rule 404(b) rulings when "supported by the facts before the court"); *cf. State v. Escalante-Orozco*, 241 Ariz. 254, 278 ¶ 77 (2017) ("Before admitting [Rule 404(b)] evidence, *the court must find* (1) clear and convincing proof that the defendant committed the act; (2) it is offered for a proper purpose under Rule 404(b); (3) it is relevant to prove that purpose; and (4) its probative value is not substantially outweighed by the danger of unfair prejudice." (emphasis added)).

## B. Voir Dire Issues

### 1. Limiting voir dire

¶15 Acuna argues the trial court arbitrarily limited voir dire, impairing his rights to a fair and impartial jury. We review a trial court's decision to impose a time limit on voir dire for an abuse of discretion. *Escalante-Orozco*, 241 Ariz. at 271 ¶ 33.

¶16 By rule, the trial court "shall control the voir dire examination and shall conduct a thorough oral examination of prospective jurors. . . . Upon the request of any party, the court shall permit that party a reasonable time to conduct a further oral examination of the prospective jurors." Ariz. R. Crim. P. 18.5(d). To prevail, Acuna must "demonstrate not only that the voir dire examination was inadequate, but also that . . . the jury selected was not fair, unbiased, and impartial." *State v. Moody*, 208 Ariz. 424, 451 ¶ 95 (2004); *see also Escalante-Orozco*, 241 Ariz. at 271 ¶¶ 33–34 (determining that despite initial time limit, trial court posed appropriate follow-up questions to jurors and defendant failed to demonstrate that the seated jury "was not fair, unbiased, and impartial").

5

¶17          Here, the trial court stated it would provide "approximately 20 minutes" per side for the small panel voir dire.  But, when defense counsel objected to the time restriction, the court asked if more time was needed and requested feedback from both parties.  Later that day, the court provided defense counsel with additional time to question prospective Juror 22 following an objection, until counsel stated, "I have no further questions."  The court then proceeded with two full pages of its own follow-up on prospective Juror 22.[2]  The trial court curtailed questioning of prospective Juror 100,[3] but then followed up with its own questions to inquire whether that juror could follow the law.  Defense counsel twice generally objected to the time limit during voir dire, and the trial court twice enforced a time limit upon defense counsel.  But, on several other occasions, the trial court allowed additional time when requested.

¶18          Although the court set time limitations, it was flexible with granting extra time when requested or by posing its own follow-up questions, *see Escalante-Orozco*, 241 Ariz. at 271 ¶¶ 33–34, and appropriately modified the time limit throughout the process.

¶19          Acuna objected to the time limits during voir dire; however, he has not demonstrated how the jury was biased, unfair, or partial in light of the general time limit imposed.  Furthermore, because of the trial court's general flexibility in not adhering to the time limit by granting more time and asking follow-up questions on multiple occasions, the court did not abuse its discretion in allowing voir dire for a "reasonable time" under Rule 18.5(d), and thus no error occurred.

---

[2] Although defense counsel asked to strike prospective Juror 22 for cause, the court ultimately declined to do so.  Acuna mentions on appeal the time limitation imposed on him for prospective Juror 22, but defense counsel ultimately used a peremptory strike to exclude this juror.  Using a peremptory challenge even when curing "a trial court's error in denying a challenge for cause, without more, does not violate the constitutional right to an impartial jury."  *State v. Hickman*, 205 Ariz. 192, 195 ¶ 11 (2003).  Thus, any error that occurred as to Juror 22 was harmless.  *See State v. Payne*, 233 Ariz. 484, 499 ¶ 24 (2013).

[3] Juror 100's responses in voir dire are discussed in detail below.  *Infra* ¶¶ 26–27.

2. <u>Juror rehabilitation and strikes for cause</u>

**¶20**      Acuna claims that prospective Jurors 23, 100, 122, and 140 (seated Jurors 4, 9, 10, and 11, respectively) expressed a predisposition for the death penalty and inability to consider mitigation. Acuna argues the court erred in failing to strike these jurors for cause. Acuna also asserts that the trial court violated A.R.S. § 21-211 by refusing to strike prospective Juror 202 (later, empaneled Juror 16) "despite her close relationship with a member of the Maricopa County Attorney's Office."[4]

**¶21**      This Court reviews a trial court's refusal to strike a juror for abuse of discretion. *State v. Lavers*, 168 Ariz. 376, 390 (1991). "[T]he party asserting that the trial court erred in denying a motion to strike a juror for cause has the burden of establishing that the juror is incapable of rendering a fair and impartial verdict." *Id.* Because Acuna objected at trial, we review any error for harmlessness. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 18 (2005).

**¶22**      As an initial matter, the State argues that because Acuna did not use his peremptory strikes on these jurors, he failed to preserve this issue for review, citing *State v. Eddington*, 226 Ariz. 72 (App. 2010), *aff'd on other grounds by* 228 Ariz. 361 (2011), and *State v. Rubio*, 219 Ariz. 177 (App. 2008). Specifically, the State argues that this Court should adopt the reasoning of the court of appeals that "in order to preserve an appellate claim that a trial court erred in failing to strike a venireperson for cause, a defendant must use a peremptory strike to remove that person from the panel." *Eddington*, 226 Ariz. at 79 ¶ 20.

**¶23**      We decline to do so, as the situations contemplated in *Eddington* and *Rubio* are inapposite. Seven of Acuna's ten peremptory strikes were used on jurors who had been unsuccessfully challenged for cause. Even if Acuna had used his remaining three peremptory strikes to remove the jurors he complains of here, there would still be two remaining trial jurors whom he tried to remove for cause. *Rubio*'s reasoning that, through peremptory strikes, "any and all unfair or biased jurors will be

---

[4] Acuna argues in his reply brief that the trial court failed to adequately rehabilitate prospective Juror 202; however, because his opening brief addresses the trial court's failure to strike Juror 202 for cause, we address the argument as raised there.

removed for cause," 219 Ariz. at 181 ¶ 12, does not account for this situation, and we therefore decline to apply such a rule in this context.

¶24 With regard to the individual jurors, a juror's preconceived notions or opinions about a case do not necessarily render that juror incompetent to fairly and impartially sit on the case. *State v. Martinez*, 196 Ariz. 451, 459 ¶ 28 (2000) (citing *State v. Poland,* 144 Ariz. 388, 398 (1985), *aff'd on other grounds sub nom. Poland v. Arizona*, 476 U.S. 147 (1986)). "If a juror is willing to put aside his opinions and base his decision solely upon the evidence, he may serve." *Id.* The trial court can rehabilitate a challenged juror through follow-up questions to assure the court that he can sit as a fair and impartial juror. *Martinez*, 196 Ariz. at 459 ¶ 28. The trial court is "in the best position to 'assess the demeanor of the venire, and of the individuals who compose it.'" *State v. Naranjo*, 234 Ariz. 233, 239 ¶ 12 (2014) (quoting *Uttecht v. Brown*, 551 U.S. 1, 9 (2007)).

¶25 Here, both sides and the trial court conducted extensive questioning of the challenged jurors. Prospective Juror 23 initially stated he was leaning toward the death penalty. But when defense counsel revisited this statement and asked whether the juror would favor the death penalty after a guilty verdict, the juror replied that he would not, because mitigation would still need to be shown. The trial court directly asked whether prospective Juror 23 could keep an open mind in the penalty phase if the defendant were found guilty of first degree murder, to which the juror replied, "Yes." Prospective Juror 23 was rehabilitated and the trial court did not abuse its discretion in denying a strike for cause.

¶26 Prospective Juror 100 initially stated that she would "consider" the death penalty for intentional, premeditated murder, but would likewise consider a life sentence for the same act. She expressed some confusion about the overall process, but indicated she understood the clarifications provided. She also stated, "I know that I can be fair."

¶27 Furthermore, the trial court twice asked her, in detail, if she could follow the instructions at each stage of the process. She replied "Yes," and "I believe I can." Juror 100 was adequately rehabilitated, and the trial court did not abuse its discretion in refusing to strike her for cause. *Cf. Martinez*, 196 Ariz. at 458–59 ¶ 27 (finding juror rehabilitated who responded to judge that "I think I can be fair").

¶28 Upon initial questioning, prospective Juror 122 indicated a potential inclination for the death penalty if the death "wasn't a weird freak accident." But, following defense counsel's explanation of the different phases of the trial, the juror stated he could "consider a life penalty." Prospective Juror 122 also stated that he wanted to "have everything laid out before [he] ma[de] any kind of decision like that," and would not go into the mitigation phase leaning toward imposing the death penalty. Furthermore, although the trial judge did not question Juror 122 to require him to reconcile his views, neither did defense counsel, despite having the opportunity (choosing instead to ask questions on mitigation and whether he would be swayed by fellow jurors). *Cf. Smith*, 215 Ariz. at 231 ¶ 43 (stating that counsel must have "sufficient opportunity to determine whether a particular juror would automatically impose the death penalty upon a guilty verdict"). Prospective Juror 122 was adequately rehabilitated and the trial court did not abuse its discretion.

¶29 Prospective Juror 140 initially stated he would automatically impose the death penalty for premeditated first degree murder. Following this statement, the court and counsel conducted an extensive voir dire of Juror 140. The juror expressed confusion at certain points throughout questioning; however, when defense counsel asked, "[I]f you listen to the aggravation and you listen to the mitigation you say that aggravation is not substantial to me your vote would have to be life?" the juror replied, "Right." Defense counsel moved to strike this juror for cause based on lack of understanding, which the trial court denied.

¶30 In searching for an impartial jury, the "quest is for jurors who will conscientiously apply the law and find the facts." *Wainwright v. Witt*, 469 U.S. 412, 423 (1985); *see also Franklin v. Anderson*, 434 F.3d 412, 422 (6th Cir. 2006) (finding a juror was not impartial "because she demonstrated that she could not comprehend the legal standard that she was supposed to apply"). In *State v. Hoskins*, this Court determined that although a challenged juror "exhibited an initial, fundamental misapprehension" of burdens of proof, she responded affirmatively to follow-up questioning about understanding the law. 199 Ariz. 127, 140 ¶ 44 (2000), *supplemented*, 204 Ariz. 572 (2003). Although the juror here did not respond in the same affirmative manner as the juror in *Hoskins*, we defer to the decision of the trial judge who actually heard the testimony and observed the juror's demeanor. The trial judge denied Acuna's motion to strike this juror for cause, indicating that he thought the juror understood the process

sufficiently to serve as a fair and impartial juror. This juror was rehabilitated, and the trial court did not abuse its discretion in declining to strike him.

¶31 During voir dire, prospective Juror 202 openly admitted to a close friendship with a prosecutor in the Maricopa County Attorney's Office, but stated she thought it would "more likely than not" be irrelevant to her ability to be fair and impartial in this case. When answering questions from both parties, she also stated she would "[a]bsolutely" be open to imposing a life sentence, "[b]ecause life is precious," later stating that "[e]very life is precious. Absolutely"—an assertion which she applied to everyone in the courtroom. Defense counsel sought to remove her for cause, arguing she never stated that she could put her friendship aside; however, the trial court denied the strike for cause.

¶32 Any person who is "interested directly or indirectly in [a] matter" is disqualified from sitting on a jury in that case, as are those who are "biased or prejudiced in favor of or against either of the parties." A.R.S. § 21-211(2), (4); *see also State v. Eddington*, 228 Ariz. 361, 362 ¶ 1 (2011). But, a "juror's assurances of impartiality need not be couched in absolute terms." *Hoskins*, 199 Ariz. at 139 ¶ 37; *see also id.* at 140 ¶ 42, 141 ¶ 48 (concluding that a juror responding "I believe so" to whether he could put aside sympathy for the victim sufficed to assure the trial judge that he could remain fair and impartial). Furthermore, a juror who knows some of the people involved in a case is not automatically barred from serving on a jury. *State v. Hill*, 174 Ariz. 313, 319 (1993). Although this is a close question, particularly in light of Juror 202's subsequent conduct (discussed below, *infra* ¶¶ 51–64), prospective Juror 202's answers did not reflect an inability to decide the case fairly and impartially. The trial court did not abuse its discretion in denying the motion to strike this juror.

### C. A.R.S. § 13-751(F)(12)

¶33 The (F)(12) aggravator, § 13-751(F)(12), provides: "The defendant committed the offense to prevent a person's cooperation with an official law enforcement investigation, to prevent a person's testimony in a court proceeding, in retaliation for a person's cooperation with an official law enforcement investigation or in retaliation for a person's testimony in a court proceeding." Acuna argues (1) that this aggravator violates the Eighth and Fourteenth Amendments to the United States Constitution by

not adequately channeling the sentencer's discretion with clear, objective standards; (2) that his jury subsequently lacked sufficient guidance in interpreting the (F)(12) factor; and (3) that the (F)(12) aggravating factor requires a singular motivation or, in the alternative, that the instruction as given "permitted the jury to make a finding based upon a correlating event."

¶34        We review constitutional and "purely legal issues" de novo. *State v. Moody*, 208 Ariz. 424, 445 ¶ 62 (2004); *see also State v. Zaragoza,* 221 Ariz. 49, 53 ¶ 15 (2009) ("[W]e review de novo whether a jury instruction correctly states the law . . . ."). We also review issues of statutory construction de novo, construing statutes to preserve their constitutionality, if possible. *See State v. Hulsey*, 243 Ariz. 367, 423 ¶ 53, 426 ¶ 67 (2018).

¶35        At the close of the aggravation phase, the trial court agreed with Acuna's request to truncate the wording of the (F)(12) aggravating factor so that the jury instruction applied only to the factual situation at hand. The jury instruction read: "The Defendant committed the offense in retaliation for a person's testimony in a court proceeding." Acuna argued in his aggravation-phase closing that retaliation must be the sole reason for the murder in order for the aggravator to apply.

¶36        During deliberations, the jury asked the following question: "We would like clarification regarding the second aggravating circumstance. 'The defendant committed the offense in retaliation for a persons [sic] testimony . . .' Does this need to be the only reason? Most of the reason? A portion of the reason? 100% of the reason?" The parties could not agree on a supplemental instruction, so the trial court returned the jury's note with the following reply: "Please refer to your jury instructions and to the evidence presented to answer the above question." The jury ultimately returned a verdict finding the (F)(12) (and the uncontested (F)(2) aggravator) proven.

¶37        An aggravator must meet two criteria to be constitutional: (1) the circumstance must apply to only a subclass of defendants convicted of a murder, and (2) the circumstance must not be overly vague. *State v. Hausner*, 230 Ariz. 60, 82 ¶ 99 (2012) (citing *Tuilaepa v. California*, 512 U.S. 967, 972 (1994)). With respect to vagueness, "a factor is not unconstitutional if it has some common-sense core of meaning . . . that criminal juries should

be capable of understanding." *Tuilaepa*, 512 U.S. at 973 (internal quotation marks omitted).

¶38 The (F)(12) aggravator cannot apply to every first degree murder, and instead applies only to a particular subset of circumstances. Stated differently, not every first degree murder is committed to retaliate against or prevent a person's adverse trial testimony or cooperation in a law-enforcement investigation. The instruction provided to the jury here, as an excerpt of the full statutory provision, narrows the subclass even further, to only those defendants convicted of first degree murder of persons who testified against them in a previous court proceeding. Both the statutory provision and the provided jury instruction sufficiently narrow the aggravator to apply only to a subclass of defendants in accordance with the first of the two required criteria.

¶39 The (F)(12) aggravator also contains a common-sense core of meaning. The jury was asked to determine whether Acuna murdered Edgar "in retaliation for [Edgar's] testimony in a court proceeding." § 13-751(F)(12). "Retaliate" generally means "to repay (as an injury) in kind," or "to return like for like; *esp*: to get revenge." *Retaliate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Unlike "heinous" or "cruel," "retaliation" possesses a core meaning that an ordinary person is capable of understanding. To that end, the jury note from deliberations did not indicate a lack of understanding or confusion as to what "retaliation" meant, but whether the retaliation was required to be the only possible reason for the murder. The language of the (F)(12) aggravator sufficiently channels the sentencer's discretion and neither it, nor the provided jury instruction, was unconstitutionally vague or overbroad.

¶40 Acuna's third argument regarding the (F)(12) aggravator challenges the statutorily required causal relationship between the aggravator and the subsequent murder. We previously addressed the (F)(12) aggravator in *State v. Miller*, where the defendant "made several statements that he wanted to kill [the victims] because of their cooperation with the arson investigation," and where "[h]e began planning and taking steps to carry out the murders shortly after he was indicted for arson." 234 Ariz. 31, 45 ¶ 56 (2013).

¶41 Here, the pertinent events parallel the occurrences in *Miller*. Like the defendant's statements about the victims in *Miller*, Acuna made

statements—indeed, immediately before the murder—about doing prison time for Edgar and not wanting to ever see him again. Although longer than the timeframe in *Miller*, here sixteen months, Acuna murdered Edgar within a relatively brief period following his release from prison.

**¶42** We also find § 13-751(F)(5) and related cases instructive in determining the causal relationship for the (F)(12) aggravator. Section 13-751(F)(5) establishes Arizona's "pecuniary gain" aggravator, which the state may allege when "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." We have stated that pecuniary gain need not be the only motive for the (F)(5) aggravator to apply. *See, e.g., State v. Martinez*, 218 Ariz. 421, 435 ¶ 66 (2008) ("Pecuniary gain . . . need only be *a* motive for the murder, not the sole motive."); *State v. Kayer*, 194 Ariz. 423, 433 ¶ 33 (1999) ("A financial motive need not be the only reason the murder was committed for the pecuniary gain aggravator to apply."). Furthermore, the state "must establish that 'pecuniary gain was a *motive*, *cause*, or *impetus* for the murder and not merely the *result*.'" *State v. Garcia*, 224 Ariz. 1, 20 ¶ 91 (2010) (emphases added) (quoting *State v. Canez*, 202 Ariz. 133, 159 ¶ 91 (2002), *superseded by rule on other grounds*).

**¶43** The (F)(5) and (F)(12) aggravators both refer to a defendant's potential motivation, rather than to some set of circumstances surrounding the defendant, victim, or crime (e.g., age of those involved, status of defendant, manner of murder), and the language of both statutory provisions requires a clear causal connection. *Compare* § 13-751(F)(5) ("as consideration"; "in expectation"), *with* (F)(12) ("in retaliation"). Like the (F)(5) statutory text, nothing in the language of (F)(12) requires the state to establish that the defendant's *sole* motivation was retaliation.

**¶44** Furthermore, a clear causal connection, and not just a "correlating event," exists here. *See State v. Ring*, 204 Ariz. 534, 560 ¶ 76 (2003) ("The state must establish the connection between the murder and [pecuniary gain] motive through direct or strong circumstantial evidence."). *See also Miller*, 234 Ariz. at 45 ¶¶ 55–56. The statute does not require retaliation to be the sole motive, and, while the State must establish a clear causal connection between the motive and the murder, it did so here. *Supra* ¶ 41. *See also Miller*, 234 Ariz. at 45 ¶¶ 55–56. The trial court did not err in declining to provide further jury instructions.

### D. Trial Court Statement on Witness Testimony

¶45        Acuna argues that the trial court improperly commented upon evidence presented to the jury, denying him a fair trial and his right, under the Arizona Constitution, to independent jury evaluation of the evidence. *See* U.S. Const. amends. V, VI, XIV; Ariz. Const. art. 2, §§ 4, 24; Ariz. Const. art. 6, § 27.

¶46        During the guilt phase, a defense witness, Sylvia Z., testified that she was limited to only yes or no answers in her pretrial interview. (According to the record before us, she was not limited to only yes or no answers for the entirety of her interview.) The State argued to the trial court that defense counsel could not "allow [the testimony] to stand." Defense counsel stipulated to a short statement the judge read to the jury that she was not limited to only yes or no in her answers.

¶47        Then, during the penalty phase, mitigation witness Arianna H. testified that she was limited to only yes or no answers in her pretrial interview. (The record here shows otherwise.) Following Arianna's testimony, the State requested that the court read an instruction or stipulation to the jury that she was not so limited in her answers. Defense counsel initially refused to so stipulate, citing the prosecutor's responsibility to be prepared to impeach, instead of relying upon a stipulation. But, when the trial court proposed an instruction similar to the one given for Sylvia Z.'s testimony, defense counsel responded, "We are not opposing that, Judge. We are just saying it's not our responsibility," and further explained that "to say it's our responsibility to fix something that should be fixed by impeachment is just not appropriate, not accurate." The trial court then read the following statement to the jury:

> Ladies and gentlemen, before we get started and resume Mr. Acuna's testimony, the previous witness, [Arianna], she testified that she was required to answer questions yes or no at an interview, at a previous interview that she gave by the prosecution and the defense attorney present. She was not required to simply answer her questions yes or no, and she was given the opportunity to answer the questions. So it was not just yes or no.

In closing arguments, the State argued that Arianna had lied "under oath about her interview with the State." Acuna argues both that defense counsel was "deceived into entering" the stipulation on Sylvia Z.'s testimony and that this acquiescence was the foundation for the subsequent error with Arianna's testimony.

¶48 "Article 6, Section 27 of the Arizona Constitution prohibits judges from commenting upon evidence presented at trial." *State v. Dann*, 205 Ariz. 557, 571 ¶ 50 (2003), *supplemented*, 206 Ariz. 371 (2003). "A judge violates this prohibition by expressing 'an opinion as to what the evidence proves,' in a way that interferes 'with the jury's independent evaluation of that evidence.'" *Id.* (quoting *State v. Rodriguez*, 192 Ariz. 58, 63 ¶ 29 (1998)). Thus, a trial court stating that a witness "misspoke," and that her statement was "not appropriate" and "not what happened," is an improper comment upon the evidence. *Dann*, 205 Ariz. at 569–70 ¶ 42, 571 ¶ 51.

¶49 Here, the judge did not state an opinion or draw any inferences from the evidence. The trial court instead stated only what Arianna's testimony had been (i.e., that she was required to answer with "yes" or "no"), and then stated: "She was not required to simply answer her questions yes or no, and she was given the opportunity to answer the questions. So it was not just yes or no." This constitutes a statement of what occurred both during Arianna's testimony and during the preceding interview, devoid of opinions on or inferences from the evidence. Indeed, the jury was free to draw its own inferences from the evidence and could conclude that Arianna had prevaricated, misremembered, or misunderstood the guidelines of the pretrial interview. Therefore, the judge did not impermissibly comment upon the evidence in violation of Acuna's constitutional rights.

¶50 Furthermore, defense counsel's explicit statement upon reading the instruction ("We are not opposing that, Judge") establishes the instruction as a "matter[] of fact conceded at trial." *See State v. Willits*, 96 Ariz. 184, 189 (1964) (stating that the trial court may assume "matters of fact conceded at trial or established by uncontradicted or uncontroverted evidence . . . in an instruction"). The trial court did not abuse its discretion in instructing the jury regarding Arianna's testimony.

### E. Motion to Vacate Judgment or Hold Evidentiary Hearing

¶51        Acuna argues that, because of Juror 16's concealed pro-State bias, he was denied his right to be tried by a fair and impartial jury and that the trial court abused its discretion in denying his motion to vacate judgment or hold an evidentiary hearing on newly discovered evidence when Juror 16's post-trial blog posts were uncovered.

¶52        We review a trial court's decision on a motion to vacate judgment, and to grant an evidentiary hearing thereon, for an abuse of discretion. *See State v. Parker*, 231 Ariz. 391, 408 ¶ 77 (2013).

¶53        As discussed above, *supra* ¶ 31, Juror 16 disclosed during voir dire a personal friendship with a Maricopa County prosecutor, for which Acuna requested a strike for cause but which the trial court denied.

¶54        On October 7, 2014 (the day following the jury's death verdict), Juror 16 posted a blog about her experiences, updating it on October 26, 2014. Early in the post, she described her reaction to the defense attorney questioning her during voir dire:

> I was surprised to be singled out, as not everyone was. . . . I had made mention that I was Wiccan, and that while I believed in karma, the Law of Arma, etc., I still had a strong conviction that I could be a fair and impartial judge. . . . He kept asking me about my karma, and how it would be affected if I condemned a man to die. . . . During the conversation the defense attorney's manner became condescending. It offended me, it made me feel *defensive*. My body language became closed off, and at one point I angled my entire body away from him . . .

¶55        She then shared her opinion of the prosecutor:

> Next was the State Prosecuting Attorney. She once again asked me questions about my spiritual beliefs. Her manner was professional and cordial. Although I was grateful, I didn't want it to seem like I was predisposed to like her better simply because she was much nicer than her defense counterpart, so I relied on as much military bearing as I could

muster. I didn't smile. I didn't joke, and I answered as honestly as I could. (If you know me, you know how soul crushingly hard that was for me!)

¶56　　　　Recounting the conduct of the trial she described her dissatisfaction with the prosecution and particularly the defense. Focusing on the defense, for example, she wrote:

> The prosecution was all politeness and comfort. The defense was all douchebaggery and well . . . defense. A couple of the Latina witnesses (I'm not Mexican, I prefer the term Latina) got a little "zesty" when defense would try to lay "traps" (?) about their neighborhood and subsequent Latino/Hispanic population. Sometimes it was a little irritating. They would have made a better impression had they just stuck to answering the question as swiftly and honestly as they could. When dealing with lawyers it's better to say too little than too much, and ANYTHING can and will be used against you in a court of law.

¶57　　　　Acuna moved to vacate the judgment under Arizona Rule of Criminal Procedure 24.2, arguing that Juror 16 had an undisclosed anti-defense bias and her service as a juror rendered Acuna's convictions and sentences unconstitutional. The trial court denied Acuna's motion, concluding that the blog did not constitute "newly discovered evidence," and did not demonstrate the juror had an anti-defense bias during voir dire and trial.

¶58　　　　Under Rule 24.2, the trial court may vacate judgment if newly discovered material facts exist under the standards of Arizona Rule of Criminal Procedure 32.1. Ariz. R. Crim. P. 24.2(a)(2) (2014). To justify post-conviction relief based upon newly discovered evidence, five requirements must be met:

> (1) the motion must show that the evidence relied on is, in fact, newly discovered; (2) the motion must allege facts from which the court can infer due diligence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) the evidence must be material to the issue involved; and (5) it

must be evidence which, if introduced, would probably change the verdict if a new trial were ordered.

*State v. Serna*, 167 Ariz. 373, 374 (1991). "[E]vidence is material if it is relevant and goes to substantial matters in dispute or has a legitimate and effective influence or bearing on the decision of the case." *State v. Orantez*, 183 Ariz. 218, 221–22 (1995).

**¶59** A defendant is entitled to an evidentiary hearing regarding a claim of newly discovered evidence if he or she presents a "colorable claim." *State v. Bilke*, 162 Ariz. 51, 52 (1989). Here, the trial court found no colorable claim requiring an evidentiary hearing. *See State v. Amaral*, 239 Ariz. 217, 219 ¶ 9 (2016) (quoting *Bilke*, 162 Ariz. at 52) (listing the five required elements for a colorable claim).

**¶60** "Arizona follows a policy long followed by courts nationwide. The general rule, known as Lord Mansfield's rule, is that a juror's testimony is not admissible to impeach the verdict." *State v. Nelson*, 229 Ariz. 180, 191 ¶ 48 (2012) (quoting *State v. Dickens*, 187 Ariz. 1, 15 (1996), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239 (2012)). The rule, clarified in Arizona Rule of Criminal Procedure 24.1(d), serves "to protect the process of frank and conscientious jury deliberations and the finality of jury verdicts." *Id.* (quoting *State v. Poland*, 132 Ariz. 269, 282 (1982)); *see also* Ariz. R. Crim. P. 24.1(d) (providing that "the court may receive the testimony or affidavit of any witness, including members of the jury, that relates to the conduct of a juror, a court official, or a third person," but that "the court may not receive testimony or an affidavit that relates to the subjective motives or mental processes leading a juror to agree or disagree with the verdict"). If a verdict could be impeached based on a juror's mental process at the time of deliberation, "no verdict would be safe." *Nelson*, 229 Ariz. at 191 ¶ 49.

**¶61** Statements by jurors about their own or another's subjective feelings, developed during trial, are not competent evidence to impeach a verdict. *State v. Cruz*, 218 Ariz. 149, 159 ¶ 33 (2008); *Dickens*, 187 Ariz. at 16. In *Cruz*, a juror, who disclosed in voir dire that her husband was a policeman, gave a statement to the press following the penalty phase verdict that if the sentence "deters a criminal and saves a peace officer's life in the future, then the message we sent in our decision is positive. The message is, 'It is not OK to take a peace officer's life.'" 218 Ariz. at 159 ¶ 32.

This Court declined to consider such evidence in considering whether the trial court properly denied a motion to strike the juror, stating that, "[s]ubject to only a few exceptions, a juror's out of court statement is not admissible to contradict the verdict." *Id.* ¶ 33.

¶62        A defendant may be entitled to a new trial only if a juror conceals facts pertaining to his qualifications or bias on proper inquiry during voir dire. *Wilson v. Wiggins*, 54 Ariz. 240, 243 (1939). Consequently, juror affidavits could be used to prove that one or more of the jurors intentionally concealed bias or prejudice on proper voir dire examination, *Dickens*, 187 Ariz. at 16–17 ("Because his alleged bias surfaced during jury deliberations, and there is no evidence of intentional concealment during voir dire, we find no error in the judge's refusal to grant a mistrial based on juror misconduct. Accordingly, the judge did not err in denying a new trial on grounds of juror misconduct."), or that they made statements evidencing racial animus that "cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict," *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017).  The blog contained indications of the juror's thoughts and feelings prior to, during, and after trial.  As such, the blog reveals her potential biases as they existed during trial, and nothing in her blog indicates she harbored racial animus toward Acuna.

¶63        When the blog post is read as a whole, it appears that Juror 16's initial reaction to defense counsel stemmed from how defense counsel had conducted voir dire.  In its ruling denying the motion to vacate the judgment, the trial court focused on the final two *Bilke* factors, determining that the blog entry was not material to the issue(s) involved, and was not likely to change the verdict or sentence.  After reviewing the blog post in its entirety, the trial court found that "[t]he juror's blog entry does not demonstrate an anti-defense bias during voir dire and trial that prevented her from being a properly-impanelled [sic] juror."

¶64        Juror 16's blog post does not reflect intentional concealment of her or any other juror's bias during voir dire and is otherwise inadmissible to challenge the verdict.  Therefore, the trial judge did not abuse his discretion in denying Acuna's motion to vacate judgment without holding an evidentiary hearing.

### F.  Prosecutorial Misconduct

¶65         Acuna raises several prosecutorial misconduct claims, arguing that the prosecutor's pervasive and persistent misconduct infected the trial and deprived him of due process and a fair trial.

¶66         This Court reviews claims of prosecutorial misconduct by assessing each claim of misconduct, "review[ing] objected-to claims for harmless error and unobjected-to claims for fundamental error."  *Hulsey*, 243 Ariz. at 388 ¶ 88.  "After determining which claims constitute error, this Court reviews the cumulative misconduct" to conclude whether the total errors resulted in an unfair trial.  *Id.*  To reverse, prosecutorial misconduct must be present, and a "reasonable likelihood [must] exist[] that the misconduct could have affected the jury's verdict, thereby denying the defendant a fair trial."  *Martinez*, 230 Ariz. at 214 ¶ 24 (quoting *State v. Anderson*, 210 Ariz. 327, 340 ¶ 45 (2005)).  "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (internal quotation marks omitted) (quoting *State v. Hughes*, 193 Ariz. 72, 79 ¶ 26 (1998)).

### 1. Opening statements

¶67         Acuna claims that the prosecutor committed misconduct when she said in her opening statement that the case was not a "who dun it," and that there "were no witnesses outside in that dark stormy parking lot on August 3rd."  In fact, two defense witnesses testified that they were in the parking lot.  Defense counsel objected only to the second statement of the prosecutor.  The trial court then asked the prosecutor to confine herself to a preview of the evidence.

¶68         Opening statements are opportunities for counsel "to tell the jury what evidence they intend to introduce.  Opening statement is not a time to argue the inferences and conclusions that may be drawn from evidence not yet admitted."  *State v. Lynch*, 238 Ariz. 84, 92 ¶ 9 (2015) (quoting *State v. Bible*, 175 Ariz. 594, 602 (1993), *overruled on other grounds by Lynch v. Arizona*, 136 S. Ct. 1818 (2016)).

¶69         Here, even if the prosecutor's statements were improper inferences from evidence that would be introduced, see, e.g., *State v.*

20

*Goudeau*, 239 Ariz. 421, 466 ¶¶ 196–98 (2016), they were harmless in light of the trial court's initial instructions noting that opening statements are not evidence and subsequent admonishment to the jury.

### 2. Witness testimony

**¶70** Acuna also claims that the prosecutor committed misconduct when she objected to witness testimony on two occasions, once saying "not true," and once referring to a tape recording of the witness that was not in evidence. Defense counsel objected to these statements.

**¶71** In general, it "is highly inappropriate for a prosecutor to convey his or her personal belief about the credibility of a witness." *Martinez*, 230 Ariz. at 215 ¶¶ 29–30 (internal quotation marks and alterations omitted) (quoting *State v. Lamar*, 205 Ariz. 431, 441 ¶ 54 (2003)) (addressing a prosecutor making facial expressions which "signaled that the State did not believe the evidence [the defendant] was presenting"). Any conflicting evidence is for the jury, as the finder of fact, to resolve. *State v. Trotter*, 110 Ariz. 61, 64 (1973). And, although "[c]ounsel are given wide latitude in *argument*, . . . their comments must be based on the evidence or reasonable inferences which may be drawn from it." *State v. Bailey*, 132 Ariz. 472, 479 (1982) (emphasis added). But, counsel "may not refer to evidence which is not in the record or 'testify' regarding matters not in evidence." *Id.* at 477–78. To determine whether this has occurred, this Court analyzes: "(1) whether the remarks called improper matters to the jury's attention, and (2) the probability under the circumstances that the improper remarks influenced the jury's verdict." *State v. Roscoe*, 184 Ariz. 484, 496–97 (1996).

**¶72** The prosecutor's commenting on the veracity of a witness and referring to evidence outside the record were inappropriate: directly stating a witness's testimony was "not true" and referring to a tape recording not admitted into evidence called the jury's attention to improper matters. *See id.* at 496–97.

**¶73** But, even with these improper comments, the jury's verdict must have been improperly influenced by the statements. *Id.* at 497 (stating that improper remarks on their own do not necessarily indicate prejudice); *State v. Mincey*, 130 Ariz. 389, 409–10 (1981). These comments occurred following the prosecutor's thorough impeachment of both witnesses, so

they were cumulative, isolated, and therefore harmless. The comments were not "so egregious that [they] permeated the entire trial and probably affected the outcome." *State v. Bolton*, 182 Ariz. 290, 308 (1995).

### 3. Stipulations to jury

**¶74** Acuna argues that the prosecutor committed misconduct in requesting the stipulations that the trial court read to the jury, which contradicted the testimony of Sylvia Z. and Arianna H., thereby violating the Arizona Constitution and allowing the prosecutor to bolster her arguments that the witnesses had lied. *See supra* ¶¶ 45–50. We disagree. Just as reading the stipulations were not error, the prosecutor did not engage in misconduct by requesting them.

### 4. Vouching

**¶75** Acuna next argues that the prosecutor engaged in several instances of vouching. Two general forms of prosecutorial vouching exist: (1) when "the prosecutor places the prestige of the government behind its witness"; or (2) when "the prosecutor suggests that information not presented to the jury supports the witness's testimony." *State v. Vincent*, 159 Ariz. 418, 423 (1989). Placing the prestige of the state behind its witness "involves personal assurances of a witness's veracity," while "[t]he second type of vouching involves prosecutorial remarks that bolster a witness's credibility by reference to matters outside the record." *State v. King*, 180 Ariz. 268, 277 (1994) (internal quotation marks omitted) (quoting *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)).

#### a. "Focus on 'the real facts'"

**¶76** During guilt-phase closing arguments, the prosecutor asked the jury to "focus on the real facts from the real events and the real harm defendant [Acuna] caused," concluding that, "when you focus on the real evidence and the real events and you avoid the distractions, I submit to you that the entirety of the evidence in this case will leave you firmly convinced of the defendant's guilt."

**¶77** The presumption that jurors follow a court's instructions that lawyers' statements are not evidence, *State v. Newell*, 212 Ariz. 389, 403 ¶ 68 (2006), eradicates a slight possibility of any taint from vouching when the

state follows up with an appropriate limiting comment, *see State v. Payne*, 233 Ariz. 484, 512 ¶ 113 (2013), or when the statements are solitary or isolated, *see State v. Lamar*, 205 Ariz. 431, 441–42 ¶¶ 53–54 (2003), *supplemented*, 210 Ariz. 571 (2005); *State v. Taylor*, 109 Ariz. 267, 274 (1973).

¶78 Nowhere in this statement did the prosecutor mention that the *State* provided the jury with "real facts," and the prosecutor also emphasized in close proximity to this argument that the jurors were the sole determiners of facts, and what the lawyers say is not evidence. This was not impermissible vouching.

### b. *"You have been presented with the truth"*

¶79 In rebuttal during the guilt-phase closing, the prosecutor argued, "[T]he defendant wants you to stop at the manufactured testimony of Griselda and Sylvia, and we ask that you fight a little harder past that. You have been presented with the truth."[5]

¶80 Acuna did not object to this statement at trial and so we review only for fundamental error. *See State v. Laird*, 186 Ariz. at 206 (1996).

¶81 Although the prosecutor did not argue that the State had provided the jury with the truth, the juxtaposition of "manufactured" defense witness testimony against "the truth" implied that the prosecution was indeed the party that had provided the jury with "the truth." This was impermissible vouching. *See Vincent*, 159 Ariz. at 423.

¶82 Acuna argues that these comments were "improper advice to the jury on how to decide this case," and it "impaired the jury's ability to consider" his defense. But, Griselda and Sylvia were thoroughly impeached on cross-examination, and the isolated nature of this comment, which relies heavily on implication, did not prejudice Acuna.

### c. *"We know"*

¶83 Acuna next argues that the prosecutor's use of "we know" inappropriately related her personal opinion of his guilt and improperly

---

[5] Acuna argues that this statement also impugned his defense counsel. We address that argument separately, see *infra* ¶¶ 95–96.

placed the prestige of the government behind the State's evidence, particularly when she told the jury, "We know that the defendant had gunshot residue on him not just because he has bad luck, but because he's the one that used the gun to cause all of this damage," and that, "We know the defendant attempted to shoot and kill Perla."

¶84 Although these comments from the prosecutor come close to the line, they do not use "I" or "me" to indicate what her *personal* view of the case was to the jury. Thus, the prosecutor did not impermissibly express her personal opinion to the jury. *See*, *e.g.*, *United States v. Ruiz*, 710 F.3d 1077, 1086 (9th Cir. 2013) (stating that it is permissible to use the words "we know" to describe the evidence where prosecutor "did so only to 'marshal evidence actually admitted at trial and reasonable inferences from the evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements'" (quoting *United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005))).

¶85 But, like the Ninth Circuit in *Younger*, 398 F.3d at 1191, we find the use of "we know" on behalf of the government concerning. This is because there is a fine contextual line between the use of "we know" inclusively, i.e., to describe evidence and outline inferences from that evidence with the jury, and the use of "we know" in an exclusive manner, i.e., to refer to the State collectively. A reading of the prosecutor's closing arguments displays both uses of "we." The prosecutor's repeated uses of "we," particularly with contrasting uses of "you" to refer to the jury, come close to the line here, contrasting with *Ruiz*, 710 F.3d at 1086 n.5 ("How do we know that . . . ? . . . Officer Peck saw him do it; but it's not just that. We know Officer Peck was correct because he told the guy on the ground . . . ."); however, we do not find that this pronoun usage, by itself, rises to the level of fundamental, prejudicial error. But we caution prosecutors to refrain from using "we know" and similar phrases to suggest that their argument bears the imprimatur of the state.

### d. State's witnesses

¶86 Acuna also argues that the prosecutor vouched with the following statement in her guilt-phase rebuttal closing argument:

24

> And as you know, and as you recognize, of course, there is [sic] going to be differences in people's memories, their testimony. Because imagine if you heard nothing but a parade of witnesses who said exactly the same thing, exactly the same way, what would the allegation then be? The government coached them. The government practiced with them. The government is asking them to lie to further the government's agenda, and that didn't happen.

Specifically, Acuna argues that, by telling the jury that the government's witnesses did not lie, the prosecutor was "implicitly telling the jury that the State's witnesses had told the truth," and that these comments were "improper advice" to the jury on how to decide the case. He cites no authority for these arguments; furthermore, these comments do not use "I" or "me" to indicate what her *personal* opinion on the case was to the jury, nor did she state that the government's witnesses were telling the truth. This statement therefore did not constitute vouching.

5. Misstating the law

¶87    Acuna next argues that in the following statement, the prosecutor misstated the law and improperly shifted the State's burden of proof:

> As you have learned in this case, evidence does not lie. Because the story that the defendant needs you to believe is that everyone else is wrong except [Sylvia and Griselda]. Not only that everybody is wrong, but somehow they are lying. That this whole case is an amazing series of unfortunate coincidences, that the defendant was never involved in any of this, that every person except for Sylvia and Griselda are lying to you, and they lied about everything. Lied about everything. . . . Because if what the defendant wants you to believe is true, there would be something, some sort of physical evidence that proves only one version of [Sylvia and Griselda's] relentless lying as true.

Acuna did not object to this statement.

25

¶88            Although "[i]t is . . . improper for a prosecutor to improperly argue the burden of proof," *State v. Schneider*, 148 Ariz. 441, 447 (App. 1985) (determining that such issues were cured by the length of the trial and the court's curative instructions), "[c]omments that are invited and prompted by opposing counsel's arguments are not improper if they are reasonable and pertinent to the issues raised," *State v. Trostle*, 191 Ariz. 4, 16 (1997). A prosecutor may also "make arguments and may draw inferences that are reasonably supported by the evidence." *State v. Burns*, 237 Ariz. 1, 31 ¶ 152 (2015).

¶89            The Ninth Circuit in *Ruiz* considered a similar issue, wherein the prosecutor had argued that, in order to find the defendant not guilty, the jury would have to find that officers had lied to the jury. 710 F.3d at 1082. In its analysis, the Ninth Circuit stated:

> [P]rosecutors have been admonished time and again to avoid statements to the effect that, if the defendant is innocent, government agents must be lying. It is also true, however, that the prosecution must have reasonable latitude to fashion closing arguments. Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence. In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying.

*Id.* at 1082–83. But, in *Ruiz*, the court concluded that although the "prosecutor's argument came very close to altering the burden of proof" where conflicting testimony was somewhat equivocal, the error was harmless because the "prosecutor made his 'someone must be lying' argument following a lengthy explanation of the elements that the government was required to prove, and a reminder to the jury of the government's burden of proof." *Id.* at 1084.

¶90            Here, defense counsel did argue that some of the State's witnesses' accounts were inconsistent, *see Schneider*, 148 Ariz. at 447, but the prosecutor's comments extended beyond a fair response to defense statements. That is, the witnesses' identification testimony conflicted only with other *eyewitness* testimony — i.e., the testimony of other State witnesses (police officers, forensic analysts, etc.) did not directly controvert their

testimony, as they never denied that Edgar and Perla sustained injuries, and defense counsel likewise acknowledged the victims' injuries. The prosecutor's conclusion that Acuna "need[ed]" the jury to believe that everyone but the two defense witnesses were lying conflicts with this uncontroverted physical evidence, and comes close to attempting to shift the burden of proof from the State to Acuna.

¶91　　　But, this statement occurred during her guilt-phase rebuttal closing argument, and proper instructions were provided on multiple occasions. The trial court provided the final jury instructions with the required burden of proof before closing arguments, the prosecutor mentioned the burden on the State near the beginning of her closing argument, the defense discussed the burden on the State in its closing argument, and the prosecutor mentioned it again in her rebuttal closing argument slightly after the offending comment. As such, even if error occurred, the multiple references to the State's burden of proof by the court, the defense, and the prosecutor herself ensured that this error did not cause sufficient prejudice to require reversal.

### 6. Integrity of defense counsel

¶92　　　Acuna next claims that the prosecutor committed misconduct by impugning the integrity and honesty of opposing counsel.

¶93　　　"While commentary about the defense's theory is common, an argument that impugns the integrity or honesty of opposing counsel is improper." *Hulsey*, 243 Ariz. at 390 ¶ 99; *State v. Newell*, 212 Ariz. 389, 403 ¶ 66 (2006). Moreover, this Court has "repeatedly held that a prosecutor must not make prejudicial insinuations without being prepared to prove them." *State v. Cornell*, 179 Ariz. 314, 331 n.10 (1994) (finding that the prosecutor's insinuation that defense counsel coached the Defendant's testimony was misconduct). But referring to defense evidence as "myth" or "fanciful" and attacking defense theories has been permissible, so long as it is "directed at defense *theories* rather than defense *counsel.*" *Lynch*, 238 Ariz. at 96 ¶¶ 27–29, *reversed on other grounds by Lynch v. Arizona*, 136 S. Ct. 1818 (2016).

¶94　　　The criteria for determining whether such statements require reversal are whether the prosecutor's actions called the attention of the jury to matters it could not consider, and whether the jurors were influenced by

the remarks. *State v. Armstrong*, 208 Ariz. 345, 357 ¶ 61 (2004), *supplemented*, 208 Ariz. 360 (2004).

### a. *Fabricating testimony*

**¶95** Acuna asserts the prosecutor "implicitly argued" that defense counsel had fabricated testimony of two defense witnesses. He focuses on the following statements in guilt-phase closing arguments: "Neither of the sisters had any problems answering the questions posed by the defendant's lawyer. They new [sic] every answer. They didn't miss a beat, and rarely asked to have questions repeated. Compare that to how they acted on cross-examination," and "We ask because the defendant wants you to stop at the manufactured testimony of Griselda and Sylvia, and we ask that you fight a little harder past that."

**¶96** Although these statements come very close to misconduct, when taken in context, they relate to witness credibility. The prosecutor should not have highlighted Acuna's defense counsel in describing the defense witnesses' testimony, and we do not condone prosecutors appearing to accuse the defense of "manufacturing" testimony. But the second statement Acuna identifies does not even mention defense counsel and, taken in context, these statements relate to witness credibility, rather than to defense counsel's integrity, and do not constitute misconduct.

### b. *"Fooling" the jury*

**¶97** Acuna next claims that the prosecutor committed misconduct by repeating the term "plan" in her aggravation phase closing argument to suggest that defense counsel were attempting to fool the jury.

**¶98** The prosecutor used the word "plan" referring to Acuna ("the defendant's plan has changed") and to his witnesses ("a new part of this plan by the defendant's brothers and friend") but did not refer to defense counsel personally. Because these statements focus on the defendant's approach, rather than on defense counsel personally, the comments are squarely in the category of strategy critique, rather than constituting a personal attack. These comments are not improper.

### c. Impugning defense counsel for defending client

¶99　　　Acuna also argues that the prosecutor criticized defense counsel for defending him during penalty-phase closing argument when she stated:

> Any other claim that Jose killed Edgar that doesn't involve revenge or retaliation is not evidence of remorse because we ask you, ladies and gentlemen, what two words were ignored by [defense counsel] in his closing arguments yesterday when he talked about bleeding, being hurt and anger [sic]? [Defense counsel] did not once admit to you Jose killed Edgar in revenge or in retaliation. . . . Do not stand up here and talk about character as mitigating and ignore the why [sic] the defendant committed this crime and the how [sic] he committed this crime, and don't stand up here and say in front of the victim's family if only the defendant just left maybe this wouldn't have happened. Really?

Acuna argues that the prosecutor both implicitly argued that defense counsel had a duty to concede the aggravating circumstance and impugned the character of defense counsel for defending their client.

¶100　　　The topics on which the prosecutor touched here were a proportionate response to the topics defense counsel addressed in aggravation-phase closing arguments and as a result, no prosecutorial misconduct occurred.

### d. Impugning the right to a constitutional defense

¶101　　　Acuna's next claim of misconduct is that the prosecutor "argued that Mr. Acuna should be sentenced to death because he exercised his right to trial":

> The State is asking you to impose the death penalty on a 25-year-old man who is tried and convicted of an adult felony and tried and convicted of first degree premeditated murder. A man who in the first month of trial wanted you to believe he was not the killer, and a man who wants you to believe

29

because his defense attorney argued or ignored that this was
a witness retaliation killing.

Acuna did not object immediately after this argument.

¶102        Here, although Acuna argued during the guilt phase that he
was not the shooter, he was precluded from arguing any residual doubt
before the jury in subsequent phases.  Although the State's highlighting of
inconsistency in trial strategy veers toward concerns that may be associated
with a defendant's constitutional right to present a complete defense, *see*
*State v. Hardy*, 230 Ariz. 281, 291 ¶ 49 (2012) (stating that a defendant has a
constitutional right to present a defense, albeit limited to evidentiary rules),
the prosecutor's comment was an attack on trial strategy and not against
the defense attorneys themselves and did not directly interfere with
Acuna's right to present a defense.  As such, this did not constitute
prosecutorial misconduct.

### 7.   Comment on right to remain silent

¶103        Acuna next argues the prosecutor commented on his right to
remain silent when she stated in penalty-phase closing arguments:

> The defense cannot expect you to agree that as evidence of the
> defendant's remorse is he told, according to Ms. Sandra P[.],
> that when she said, "Did you kill him? I hope not."  Are you
> kidding me? . . .  Have the defense argue which of those bullet
> strikes the defendant hoped would not kill Edgar S[.]. . . .  The
> defense does get a chance to respond, so maybe he can tell
> you which bullet the defendant hoped wouldn't be a killing
> bullet.

¶104        "In Arizona, a prosecutor is prohibited both by constitution
and by statute from bringing to the jury's attention either directly or
indirectly the fact a defendant did not testify."  *State v. Schrock*, 149 Ariz.
433, 438 (1986) (citing Ariz. Const., art. 2, § 10; A.R.S. § 13-117(B)).  The
United States Constitution similarly prohibits such commentary.  *State v.
Arredondo*, 111 Ariz. 141, 145 (1974) (citing *Griffin v. California*, 380 U.S. 609
(1965)).  "Whether a prosecutor's comment is improper depends upon the
context in which it was made and whether the jury would naturally and
necessarily perceive it to be a comment on the defendant's failure to testify."

*State v. Rutledge*, 205 Ariz. 7, 13 ¶ 33 (2003), *supplemented*, 206 Ariz. 172 (2003). "Statements which are a fair rebuttal to an area opened by the defense do not violate the fifth amendment." *State v. Gillies*, 135 Ariz. 500, 510 (1983).

**¶105** In *Gillies*, defense counsel argued in closing that the state's evidence had no real connection to the defendant. The prosecutor then said during closing argument:

> All other evidence points to the defendant. His cigarette on the rock on top of her body, as in the car, all the physical evidence that had been taken from the vehicle, all her property, he didn't try to explain that because he couldn't. All of that evidence shows that there were two men involved and the defendant was one of the two men.

*Id.* Although a prosecutor may not comment on a defendant's failure to testify "if such reference is calculated to direct the jury's attention to defendant's exercise of his fifth amendment privilege," we concluded this was not such a case, because the "prosecutor's comments were fair rebuttal to the remarks of defense counsel." *Id.*

**¶106** Here, the challenged comments were in rebuttal to defense counsel's argument that Acuna was remorseful. The prosecutor's comment that "[t]he defense does get a chance to respond, so maybe he can tell you which bullet the defendant hoped wouldn't be a killing bullet," when read contextually, refers to one of the defense attorneys, as the prosecutor states that the *defense* can tell the jury which bullet the *defendant* hoped would not be a "killing bullet."

**¶107** Nowhere in these quoted passages does the prosecutor bring attention to the fact that Acuna did not testify. The prosecutor did not commit misconduct with these statements.

### 8. Arguments to appeal to jurors' emotions

**¶108** Acuna argues next that the prosecutor committed misconduct on several occasions by presenting arguments designed to inflame the passions of the jurors or to appeal to their fears and sympathies.

¶109        "Prosecutors are given 'wide latitude' in closing arguments." *Goudeau*, 239 Ariz. at 468 ¶ 210 (quoting *State v. Herrera*, 174 Ariz. 387, 396 (1993)). This includes arguing all reasonable inferences from the evidence. *State v. Hughes*, 193 Ariz. at 85 ¶ 59. Even if a prosecutor's argument extends beyond the limits of permissible argument, the consideration is whether the argument was "so unduly prejudicial as to have amounted to a denial of a fair trial" and whether, "under the circumstances of a particular case, the remarks of counsel were likely to have influenced the jury in reaching a verdict." *State v. King*, 110 Ariz. 36, 42–43 (1973) (concerning a prosecutor expressing personal opinion, vouching for state's witnesses, and misstating testimony). Statements have the potential to improperly appeal to jurors' emotions, prejudices, or passions when they urge the jury "to convict [the] defendant for reasons wholly irrelevant to his own guilt or innocence." *Herrera*, 174 Ariz. at 397 (1993) (internal quotation marks omitted).

### a. The State's argument that the jurors had a stake in the decision

¶110        In her closing guilt-phase argument, the prosecutor stated to the jury, "And you, especially in this case, have a stake in how things are decided."

¶111        In *State v. Herrera*, we determined a prosecutor's argument was permissible when he stated:

> [I]n this case, these defendants, having committed these crimes, then it is as important to our civilized society to maintain some semblance of stability, balance, law and order . . . . Then, if the state has met its burden and the law does apply, then you do your duty so a civilized society can keep going as we honor it in our country today; that's justice. I ask you to do justice.

174 Ariz. 387, 396 (1993). We reasoned that, in context, the prosecutor's statements did nothing more than tell the jury that "justice is served when a jury requires the state to meet its burden of proof." *Id.* at 396–97. Similarly here, the prosecutor's statement referred to the jury's role in the justice system and was not error.

### b. *Witnesses angry at jurors*

¶112    Acuna next highlights the prosecutor's argument that mitigation witnesses were angry with the jurors, arguing that such comments were irrelevant, as well as intended to frighten the jury: "They are angry, I guess, at you." But, in Acuna's penalty-phase opening, defense counsel, in explaining the witnesses' behavior on the stand, asked the jury to "cut [the mitigation witnesses] a little break," because they were coming to terms with the "first stages of loss" from the news that Acuna would be either sentenced to death or life in prison.

¶113    In context, the prosecutor's statements were a fair response to the explanation offered up by defense counsel as to witnesses' attitudes while on the stand. *See Goudeau*, 239 Ariz. at 468 ¶ 210 ("A prosecutor may properly urge the jury to give more weight to a defendant's crimes than to the mitigation evidence."); *State v. Leteve*, 237 Ariz. 516, 529 ¶ 47 (2015) (quoting *State v. Forde*, 233 Ariz. 543, 572 ¶ 126 (2014)). This was not error.

### c. *Sympathy to defendant*

¶114    Acuna also argues the prosecutor committed misconduct by appealing to the jurors' emotions when she stated, "And after considering all and any mitigation, if proven, and valuing it before you give them [sic] sympathy to the defendant, we ask you to consider what sympathy the defendant [sic] and how much he showed to Edgar or to Perla." Defense counsel objected, but the trial court overruled the objection.

¶115    Asking the jury to consider the sympathy the defendant showed the victims before granting him any sympathy did not improperly inflame their passions. In *State v. Moody*, the prosecutor told jurors that Moody had no sympathy for the victims and asked the jury to have no sympathy for him. 208 Ariz. 424, 461 ¶ 155 (2004). We affirmed, noting that "we encourage jurors not to decide cases based on emotion or sympathy." *Id.* ¶ 156. The similar comments here were not improper argument and the trial court properly overruled the objection. *See id.* at 461 ¶¶ 155–56.

### d. *Justice for Edgar*

¶116    Acuna argues the prosecutor committed misconduct by urging the jury to return a death verdict to do justice for the victim: "But

sometimes like now crimes are just so outrageous, so extreme, and so violent all [sic] we hold dear in society that they cry out for the maximum penalty. Justice in this case, justice for Edgar, deserves no less." Acuna did not object at trial.

**¶117** The statement asking the jury to do "justice for Edgar" was arguably inappropriate insofar as it asked the jury to "strike some sort of balance between the victim's and the defendant's rights." *State v. Bible*, 175 Ariz. 549, 603 (1993) (stating that asking the jury to strike such a balance is improper). But, the prosecutor's statements here were far briefer than those in *Bible* and did not occur elsewhere in her opening statement or closing argument, as contrasted with the prosecutor's statements in *Bible*, which the Court ultimately concluded did not constitute reversible error. *Id.* Acuna has not demonstrated any prejudice necessary to establish that the prosecutor's statements are fundamental error.

### 9. Cumulative effect

**¶118** Finally, Acuna argues that the cumulative effect of the prosecutor's misconduct prejudiced him by infecting the trial with unfairness and demonstrated intentional improper conduct with indifference or specific intent to prejudice his right to due process, counsel, and a fair trial.

**¶119** "[L]ack of respect, poor courtroom decorum, and unnecessary verbal attacks on defense counsel and experts" are "unbecoming of an Arizona prosecutor," *Hulsey*, 243 Ariz. at 394 ¶ 123, but this Court does not "reverse convictions merely to punish a prosecutor's misdeeds []or to deter future misconduct," *Moody*, 208 Ariz. at 460 ¶ 152 (quoting *Cornell*, 179 Ariz. at 328). Instead, this Court examines "whether the cumulative effect of individual allegations 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Payne*, 233 Ariz. at 515 ¶ 134 (quoting *Hughes*, 193 Ariz. at 79 ¶ 26). Cumulative error requires reversal only when misconduct is "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial, indicating that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." *Id.* (internal citations and quotation marks omitted).

**¶120** Acuna has failed to demonstrate that the cumulative effect of any instances of misconduct in his trial "so permeated and infected his trial as to render it unfair." *See Hulsey*, 243 Ariz. at 435 ¶ 123.

### G. Arizona's Death Penalty Statutory Scheme

**¶121** Acuna argues that the Arizona death penalty statutory scheme violates the Eighth and Fourteenth Amendments to the United States Constitution and article 2, sections 4 and 15 of the Arizona Constitution by failing to "adequately narrow those defendants eligible for the death penalty." He further argues the statutory scheme violates equal protection provisions of the Eighth Amendment because the decision to seek the death penalty "is often influenced by the financial standing of individual counties across the state rather than the individual circumstances of the offense and the quantity and quality of aggravating factors in a particular case," which leads to unequal application in Maricopa County. In *State v. Hidalgo*, we recently rejected each of these arguments. 241 Ariz. 543, 548 ¶ 7, 551–52 ¶ 28, 552–53 ¶¶ 31–32 (2017), *cert. denied*, 138 S. Ct. 1054 (2018). For the reasons expressed in *Hidalgo*, we likewise reject Acuna's arguments. *See id.* at 551–52 ¶¶ 26–69, 552–53 ¶¶ 32–34.

### H. Abuse of Discretion Review

**¶122** We "review the jury's finding of aggravating circumstances and the imposition of a death sentence for abuse of discretion, A.R.S. § 13-756(A), viewing the facts in the light most favorable to sustaining the verdict[.]" *State v. Gunches*, 240 Ariz. 198, 207 ¶ 41 (2016) (citing *Naranjo*, 234 Ariz. at 249 ¶ 81). "We must conduct this review even if, as here, the defendant does not argue that the jury's verdict was an abuse of discretion." *Id.*

**¶123** The jury did not abuse its discretion in finding the (F)(2) aggravating factor based on Acuna's attempted murder of Perla and the (F)(12) aggravating factor based on Acuna's killing Edgar in retaliation for Edgar's prior testimony, as substantial evidence supports these findings.

**¶124** With regard to the jury's determination that death was the appropriate sentence, this Court must uphold a death sentence "if any reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency." *Naranjo*, 234 Ariz. at 250 ¶ 89

(citation and internal quotation marks omitted).  Even if we assume Acuna proved the various mitigating factors he argued to the jury, a reasonable juror could have concluded they were not sufficiently substantial to warrant leniency.

## I.  Issues Raised to Avoid Preclusion

**¶125**        Acuna raises twelve other constitutional claims, which he states have been previously rejected by this Court but nonetheless wishes to preserve for further review.  We decline to revisit these claims.

## CONCLUSION

**¶126**        For the reasons above, we affirm Acuna's convictions and sentences.